IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BRIAN T. ANDERSON, | ) |
| Plaintiff, | ) No. 14 C 8366 |
| v. | ) |
| CAROLYN W. COLVIN, Acting Commissioner of the U.S. Social Security Administration, | ) Magistrate Judge Sidney I. Schenkier |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff Brian T. Anderson seeks judicial review under 42 U.S.C. § 405(g) of a final decision of the Social Security Administration ("SSA") denying his request for waiver of overpayment. *See* 42 U.S.C. §§ 404(a), 1383(c)(3). After the ALJ denied the request for waiver, Mr. Anderson filed a timely request for review of the ALJ's decision with the Appeals Council. On August 28, 2014, the Appeals Council denied review, making the ALJ's decision the final determination of the Commissioner (R. 2). *See Schmidt v. Astrue,* 496 F.3d 833, 841 (7th Cir. 2007).

Before the court are the parties' cross-motions for summary judgment. For the reasons that follow, Plaintiff's motion (doc. #14: Pl. Mot. for SJ) is granted and Commissioner's motion (doc. # 16: Def. Mot. for SJ) is denied. The case is remanded for further proceedings consistent with this opinion.

---

[1] On November 5, 2014, by consent of the parties (doc. #7) and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (doc. # 8).

## I.

Mr. Anderson is a U.S. Army veteran who lost both legs and his left hand in an explosion during his tour in Iraq in 2001 (doc. # 15: Pl. Br. at 1). After recuperating and rehabilitating at Walter Reed Hospital (R. 88), Mr. Anderson began living on his own and receiving disability benefits, the alleged overpayment of which is the subject of the parties' motions for summary judgment.

Mr. Anderson argues that the ALJ committed legal error in denying his request that the SSA waive its claim for a $57,714.00 overpayment because the ALJ's determination was not supported by substantial evidence (Pl. Br. at 6). Mr. Anderson contends that he was not at fault for causing the overpayment, and that requiring repayment would be against equity and good conscience (*Id.*). The Commissioner argues that there was substantial evidence supporting the ALJ's determination (doc. # 17: Def. Mem. at 3-6).

Before addressing the parties' contentions, we review in turn the record evidence, the hearing testimony, and the ALJ's decision.

## A.

Mr. Anderson applied for Title II Disability Insurance Benefits ("DIB") on November 16, 2006 and was found by the SSA to have first met the standards for DIB in July 2002 (R. 48). On November 16, 2011, Mr. Anderson received the first of a number of notices from the SSA informing him that he may have been overpaid. The notice listed fifteen different jobs Mr. Anderson held between January 2005 and December 2010 (R. 14).[2]

---

[2] Mr. Anderson explained at the hearing that most of his earnings came from his position as a spokesperson for a wheelchair company, which paid him for the use of his image and to appear at speaking engagements, and for acting jobs when he appeared in commercials (R. 83-85). Therefore, some of the fifteen jobs listed by the SSA consisted of a single day of work.

The November 2011 notice informed Mr. Anderson that the SSA had information that his disability eligibility ended in January 2008 due to substantial gainful activity ("SGA") which had begun in January 2007, and that he was not entitled to payments as of April 2008 (R. 13-16). This notice, which the ALJ did not mention in her opinion, was the first time that the SSA informed Mr. Anderson that it was reviewing his receipt of benefits.

The November 2011 notice also explained that, after a person with a disability begins working, he or she is allowed a nine month trial period to test his or her ability to hold a job despite health problems (R. 14). According to the SSA, Mr. Anderson's trial period had lasted from January 2007 to September 2007 (R. 15). The November 2011 notice stated that if an individual demonstrates the ability to work during the trial period, then "disability ends" (*Id.*). After the trial work period ends, beneficiaries receive a thirty-six month "extended period of disability," during which the SSA will restart payments for any given month in which a claimant's work is not at the SGA level. For Mr. Anderson, the notice stated, that extended period of disability began in October 2007 and "has now ended" (*Id.*). Further, even after the trial work period ends, the SSA pays additional benefits for the month the period ends and two months thereafter, which for Mr. Anderson were January 2008 through March 2008 (*Id.*).[3]

One month later, on December 21, 2011, the SSA sent Mr. Anderson another notice, informing him that the SSA had overpaid him $39,588.00 (R. 17-19). The December 2011 notice said that the SSA found that Mr. Anderson had been working from January 2008 through September 2010, and that his entitlement to benefits ended in March 2008 (R. 17). The notice

---

[3]The thirty-six month period that began in October 2007 would end as of the beginning of October 2010. The notice does not identity the particular months (if any) during that period in which Mr. Anderson's SGA was sufficiently low that it led to the restarting of payments for that month. We might infer that the SSA found that to be the case for three months, as that could explain why the notice stated that his disability ended in January 2008 even though his trial work period ended as of the beginning of October 2007. However, the notice does not provide that explanation, and the ALJ did not explore how the SSA reached its determination of the precise disability end date.

3

stated that Mr. Anderson had become entitled to benefits again beginning October 2010, but his work status was again under review, and his benefits had been suspended as of September 2011 (*Id.*).

The December 2011 notice did not explain how the SSA arrived at the calculation that it had overpaid Mr. Anderson $39,588.00 in benefits. The notice did inform Mr. Anderson that he could request a waiver of the SSA's recovery of the overpayment, which would be granted if he showed that:

a. The overpayment was not [his] fault in any way, and

b. [He] could not meet [his] necessary living expenses if [the SSA] recovered the overpayment, or recovery would be unfair for some other reason (R. 18).

On January 10, 2012, Mr. Anderson requested a waiver of his overpayment and completed a financial statement during a meeting with an SSA claims representative (R. 22-29).[4] On the waiver request form, Mr. Anderson provided the requested financial information. Mr. Anderson also wrote an explanation that he had thought he was due the overpaid money "because I always told Social Security when I was working and did send letters," and that "I did tell Social Security that I may not be due the benefits but they continued to come" (R. 23). On January 25, 2012, the SSA sent Mr. Anderson another notice, this time informing him that the amount of overpayment was actually $57,714.00 (R. 30). The January 2012 notice did not explain the reason for the discrepancy between the December 2011 and January 2012 overpayment calculations; nor did the January 2012 notice refer to Mr. Anderson's waiver request.

---

[4]An SSA representative helped Mr. Anderson amend his financial information form to accurately reflect his monthly income and expenses. As amended, it shows that Mr. Anderson received $9,585.00 per month from a combination of working and VA pension benefits, and had expenses of $5,394.00. $6,669.00 of his monthly income was in the form of his VA pension (R. 26-28).

4

In a February 16, 2012 "Report of Contact," the SSA stated that Mr. Anderson's request for waiver would be denied because he "knew or should have known this work would result in being overpaid based on the notices mailed," and further, Mr. Anderson had submitted proof of monthly expenses that showed he had the ability to repay the overpayment (R. 33). The SSA communicated the denial to Mr. Anderson on February 17, 2012, sending him a letter which explained that his request for waiver was denied because he had "performed Substantial Gainful Activity during [his] Extended Period of Eligibility for Disability Benefits," and that he "knew or should have known that working while disabled could result in overpayment" (R. 35). On March 9, 2012, Mr. Anderson received a letter from the SSA confirming the denial, explaining that his monthly income exceeded his monthly expenses, and therefore, he was able to repay the money he was overpaid (R. 37).

On March 16, 2012, Mr. Anderson participated in a personal conference with the SSA to protest the denial of his waiver request (R. 34). SSA notes from the conference stated that Mr. Anderson "stated throughout [the] personal conference that he knew he would be overpaid in benefits due to his working" (R. 41). On March 21, 2012, the SSA sent Mr. Anderson a notice again stating that his request for waiver was denied "based on the notices mailed" (R. 41).

**B.**

On February 11, 2013, Mr. Anderson participated in a hearing before an Administrative Law Judge ("ALJ") to appeal the denial of his waiver request (R. 78-89). At the hearing, Mr. Anderson appeared with his attorney and testified that when he first returned to work it was as a spokesperson for Pride Mobility, a wheelchair design company (R. 83). This job is not a routine nine-to-five position – he is paid a set amount every quarter for the use of his likeness and to make personal appearances (*Id.*). Mr. Anderson continues to work for Pride Mobility and

currently is paid $12,500.00 per quarter (an increase from $3,000.00 per quarter in 2007) (*Id.*). Mr. Anderson also receives earnings intermittently from his published book and occasional television appearances (R. 84).

Mr. Anderson testified that he knew after his "second year" that he "wouldn't be entitled benefits," which is why he wrote two letters and made a phone call to the SSA, which resulted in the SSA stopping payment (R. 85). Neither the ALJ nor Mr. Anderson's attorney questioned Mr. Anderson further about that testimony, or the letters, or the phone calls. The record does not contain any letters from Mr. Anderson to the SSA, but the November 2011 notice references a letter from Mr. Anderson as part of the information the SSA was using to evaluate his claim (R. 13).

Mr. Anderson further testified that he believed he "fell under some regulation that [he] wasn't aware of" that continued to make him eligible for benefits, because after contacting the SSA multiple times, he continued to receive payments (R. 86). Mr. Anderson did not return the checks because they were "helping him at the time," and he was able to obtain a wheelchair accessible minivan and remodel his parent's home to make it accessible for him (R. 88). Upon further questioning by his attorney, Mr. Anderson explained that the paperwork he received from the SSA, which discussed the nine month trial work period and the additional thirty-six month work period, gave him the impression that he could be working during that time (R. 87). He testified that the "[SSA] did not make it clear for [him]" (R. 87).

The ALJ herself stated that, while the record seemed to indicate two separate periods of overpayment, "it's not clear as it should be" (R. 82). Specifically, the ALJ noted that the initial period of overpayment was $39,588.00, "and then Mr. Anderson became entitled again when his earnings went down and then there was another overpayment after that making the total" (R. 82).

6

Based on a request from Mr. Anderson's attorney, the ALJ agreed that they could have the amount of overpayment recalculated if she denied waiver (*Id.*). The record does not indicate that any recalculation was performed.

## C.

In a brief written decision dated March 1, 2013, the ALJ determined that Mr. Anderson was overpaid benefits in the amount of $57,714.00 from April 1, 2008 through August 1, 2011, and further, he was at fault for the overpayment and therefore must repay the money he received (R. 10-12). In support of her conclusion, the ALJ stated that Mr. Anderson was aware of the potential impact that work would have on his DIB eligibility because during the March 2012 personal conference with the SSA field office representative, he stated throughout that he knew he would be overpaid due to his earnings (R. 12). The ALJ found that Mr. Anderson similarly acknowledged at the hearing that he knew his entitlement would not continue "if he kept working for more than a few years," and that "he wrote two letters and made phone calls to the SSA" when his checks kept coming (*Id.*).

The ALJ also noted Mr. Anderson's testimony that he was led to presume he was entitled to the benefits because he kept receiving them, but that "the claimant presumed this despite the fact that he repeatedly acknowledged he felt he was not entitled to them" (*Id.*). The ALJ found that there was no correspondence or other documentation to corroborate Mr. Anderson's statements that he had contacted the SSA, and she noted that Mr. Anderson made no attempt to return or refund the payments (*Id.*). Based upon her findings, the ALJ concluded that Mr. Anderson was at fault because he knew or should have known that accepting the payments was incorrect (*Id.*). She also found that he could repay the SSA, but stated he should be afforded a

7

reasonable repayment schedule since he needs substantially all of his monthly income to meet his many expenses (*Id.*).

## II.

In cases reviewing the final decision of the Commissioner, the ALJ's decision will be upheld if it is supported by substantial evidence. *See* 42 U.S.C.A. § 405(g); *Pepper v. Colvin*, 712 F.3d 351 (7th Cir. 2013). Evidence is substantial when it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir.2011) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)) (internal quotation marks omitted). The ALJ's finding must be supported by more than a scintilla of evidence but may be supported by less than the full weight of the evidence. *See, Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). The reviewing court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ, because the ALJ must resolve all factual issues and evidentiary conflicts. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir.2012). In rendering a decision, the ALJ "must build a logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005).

An overpayment occurs when a recipient receives more than the amount of benefits he is due (usually because he is working at the same time) and thereby becomes obligated to refund the excess amount to the SSA. *See* 42 U.S.C. § 404(a); 20 C.F.R. §§ 404.501–502. The SSA may waive the recovery of an overpayment only if: (1) the recipient is without fault in causing the overpayment; and (2) recovery either defeats the purposes of the Social Security Act ("the Act") or goes against equity and good conscience. *See* 42 U.S.C. § 404(b); 20 C.F.R. § 404.506; *see also Banuelos v. Apfel*, 165 F.3d 1166, 1173 (7th Cir. 1999) (overruled on other grounds by

*Johnson v. Apfel*, 189 F.3d 561 (7th Cir. 1999)). While the SSA has the burden of proving the overpayment exists, the recipient has the burden of showing he is entitled to a waiver of repayment. *See, Begoun v. Astrue*, No. 09 C 1555, 2011 WL 307375 at *8 (N.D. Ill. January 28, 2011).

In this case, plaintiff does not dispute that an overpayment occurred. Rather, he claims the ALJ lacked substantial evidence for finding him to be at fault; finding that recovery of the overpayment would not defeat the purposes of the Act or go against equity and good conscience; and finding the amount of the overpayment to be $57,714.00. We address each of these issues in turn.

### A.

For the purpose of determining liability for overpayment, an individual is at fault when the overpayment resulted from either (1) an incorrect statement made by the recipient that he knew or should have known was false, (2) failure to furnish information that the recipient knew or should have known was material, or (3) acceptance of a payment that he knew or could have been expected to know was not the correct amount. *See* 20 C.F.R. §§ 404.507(a)-(c), 404.506; 42 CFR § 405.355. It does not matter if the SSA is also at fault for mistakenly paying benefits to which a recipient is not entitled; if the claimant is at fault under any of the above three categories, then he or she must reimburse the SSA for the overpayment. *Id.; Kainer-Carglie v. Colvin*, No. 11 C 7435, 2013 WL 5587084 at *4 (N.D.Ill. October 10, 2013). "The decision which must be reached in a fault determination is highly subjective, highly dependent on the interaction between the intentions and state of mind of the claimant and the peculiar circumstances of his situation." *Kainer–Cargile*, 2013 WL 5587084, at *4 (quoting *Begoun v. Astrue*, 2011 WL 307375, 7 (N.D.Ill.2011)).

9

In this case, there is no evidence that Mr. Anderson made false statements or withheld material information. Quite to the contrary, the evidence is that he candidly disclosed his earnings, and indeed, that is what led the SSA to determine that he no longer was eligible for benefits. Rather, the ALJ concluded that Mr. Anderson was at fault under the third criterion: that he knew or should have known that he was overpaid during the period of April 1, 2008 through August 1, 2011. But, in so finding, the ALJ did not sufficiently explore or address the evidence in a way that allows us to understand her basis for concluding that Mr. Anderson knew as of April 2008 (the beginning of the overpayment period) that he should not be getting benefits.

To be sure, Mr. Anderson stated at the hearing and at a 2012 personal conference with the SSA that he knew at some point that his work would preclude the continued receipt of benefits (R. 41, 85). But, the ALJ failed to pin down just when that point occurred. We note that the first notice of overpayment that Mr. Anderson received from the SSA was in November 2011. Mr. Anderson did testify that after his "second year" he "knew pretty much" that he wouldn't be entitled to benefits. But, we have no evidence of record or explanation by the ALJ for precisely when that second year began. And, when that second year began implicates, at a minimum, the period of overpayment for which Mr. Anderson may be at fault.

For example, if "the second year" means the second year after Mr. Anderson's trial work period that the SSA says commenced in January 2007 (R. 15), that could mean Mr. Anderson "pretty much knew" he no longer should be receiving benefits as of early 2008 (if the "second year" meant the *beginning* of the second year) or early 2009 (if it meant after the *end* of the second year). Or, if "the second year" referred to the period after he began work with GEP Talent Services in February 2009 (R. 14), that could mean Mr. Anderson "pretty much knew" his benefits should end by early 2010 or 2011. There are other possible interpretations of "the

10

second year" as well. We do not know which of these possibilities apply, and we do not know how the ALJ concluded that Mr. Anderson knew or should have known he was being overpaid as of April 2008.[5]

Additionally, the ALJ did not address any of the subjective factors that might have impacted the reasonableness of Mr. Anderson's belief that he was entitled to the benefits he received. One of these factors is the irregular nature of his earnings. Not only did Mr. Anderson earn different amounts each month, in 2011 and 2012 he received notices from the SSA indicating that at several times between September 2007 and October 2011, his earnings had fallen below SGA levels, and thus, his benefits were being reinstated. In a comparable situation, the court in *Niemczewski v. Heckler*, No. 84 C 7681, 1985 WL 1831, at *3 (N.D. Ill. June 12, 1985), found that the ALJ's finding of fault was unsupported by substantial evidence. "In light of the widely varying monthly wages…it is unclear how the claimant should have known she was receiving excess benefits. [The claimant] kept the SSA informed of her wages…and she could reasonably have expected that any overpayment notices would have been forthcoming if there had been any errors." We have a similar situation here; Mr. Anderson received wages sporadically, kept the SSA fully apprised of his earnings, and attempted to confirm his continued eligibility in the face of arguably confusing notices (*see*, R. 86: "[E]ven after getting a letter stating that I was overpaid, I still got paid a couple of months after that . . .").

The ALJ's failure to address these factors leads us to remand. As a result of proceedings on remand, the ALJ may determine that Mr. Anderson is at fault (*i.e.*, he knew or should have known he was being overpaid) for all of the period of overpayment; for none of the period of

---

[5] Mr. Anderson testified that he wrote letters and made a phone call to the SSA when he "pretty much knew" he no longer was entitled to benefits, and this "resulted in them stopping payment" (R. 85). This suggests that "the second year" preceded the November 2011 notice. As we have noted, the letters are not in the record. The ALJ failed to address this omission in the record – even though the SSA's November 2011 notice stated that the SSA had received at least one "letter from Mr. Anderson" (R. 13).

11

overpayment; or for only part of the period of overpayment, in which case a partial waiver (or adjustment of payment) may be appropriate. 42 U.S.C § 404(b).

**B.**

If the ALJ were to find on remand that Mr. Anderson was without "fault" for all or some portion of the overpayment, she must then address the second element of the waiver analysis. In her opinion, the ALJ did consider – albeit briefly – one part of that second element: whether requiring repayment would defeat the purposes of the Social Security Act. However, the ALJ failed to address whether requiring repayment would also be against equity and good conscience. This treatment of the second element of the waiver test falls short for two reasons.

*First*, under the regulations, the term "defeat the purpose" of the act is defined to mean "to deprive a person of income required for ordinary and necessary living expenses." 20 C.F.R. § 404.508(a). The ALJ found that Mr. Anderson "has the ability to repay the funds" (R. 12), although she does not cite to the record to support this statement.[6] But, the ALJ also acknowledged that Mr. Anderson's attorney indicated that he needed "substantially all of his monthly income to meet his many expenses" (*Id.*). The ALJ concluded that this did not preclude Mr. Anderson from making repayment, but indicated that "he should be afforded a reasonable payment schedule" (*Id.*). Without knowing what the ALJ deemed Mr. Anderson's income and expenses to be, we cannot determine the basis on which Mr. Anderson could repay $57,714.00 on a "reasonable payment schedule" (or what that schedule might be), even if he needs substantially all of his monthly income for expenses. If the ALJ deemed Mr. Anderson's

---

[6]We recognize that the record contains a financial statement that Mr. Anderson completed with the assistance of an SSA representative that appears to indicate his monthly expenses are less than his monthly income (R. 27, 42). The ALJ does not reference this document in her decision.

12

assertion of need to lack credibility, the ALJ did not say so – much less explain the basis for such a finding.

*Second*, even if repayment would not defeat the purposes of the Act, as part of the second element of waiver, an ALJ must consider whether repayment will be against equity and good conscience. That occurs if the individual either: (1) changed his position for the worse or (2) relinquished a valuable right because of reliance on a notice that a payment would be made or because of the overpayment itself. 20 C.F.R. § 404.509(a). An individual's financial circumstances are immaterial to the question of whether repayment is "against equity and good conscience." 20 C.F.R. § 404.509(b). Mr. Anderson testified that he used the allegedly overpaid benefits to purchase a van that could accommodate his wheelchair and also to make renovations to his parents' home so that he was able to live there. Whether these types of expenditures could be considered to have changed Mr. Anderson's position for the worse or to have given up a valuable right are questions the ALJ should consider on remand, if she finds Mr. Anderson is without fault as to some or all of the overpayment.

### C.

Finally, even if the ALJ concludes that Mr. Anderson is not entitled to a waiver, we find a lack of substantial evidence for the amount of $57,714.00. The December 2011 notice stated an overpayment of $39,588.00 and the January 2012 notice stated an overpayment amount of $57,714.00. Neither the January 2012 notice nor anything else we find in the record explains the basis for that increase of more than $18,000.00. Mr. Anderson's attorney raised a concern about this discrepancy and specifically asked for a recalculation, and the ALJ stated that the amount could be "recalculated if need be" (R. 82).

13

However, the ALJ's opinion summarily found the overpayment to be $57,714.00 (R. 11-12). The ALJ did not explain the basis for the amount. Indeed, the ALJ did not acknowledge that this $57,714.00 was inconsistent with the initial SSA calculation of $39,588.00, or give any indication that any work had been done to verify the calculation. On remand, if the ALJ finds that Mr. Anderson is not entitled to a waiver of any overpayment, she must articulate – with evidence – the basis for the specific amount of any overpayment she finds.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment (doc. # 14) is granted and the Commissioner's motion for summary judgment (doc. # 16) is denied. The case is remanded to the SSA for further proceedings consistent with this opinion. This case is terminated.

**ENTER:**

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**DATE: March 24, 2016**